COMMONWEALTH *vs.* MICHAEL RILEY
(and a companion case[1]).

No. 08-P-518.

Plymouth. December 4, 2008. - February 23, 2009.

Present: GRASSO, KATZMANN, & SIKORA, JJ.

*Grand Jury. Practice, Criminal,* Capital case, Grand jury proceedings, Dismissal, Indictment. *Homicide.*

Discussion of the nature and function of the grand jury [726], and of the quantum of evidence required to indict and commence a criminal prosecution [726-727].

In proceedings arising from indictments charging the codefendants with murder in connection with the death of their four year old daughter, the Superior Court judge erred in dismissing so much of each indictment as alleged murder in the first degree and, as to the remaining charge of murder in the second degree, precluding the Commonwealth from proceeding at trial on theories of first prong and second prong malice, where the evidence presented to the grand jury established probable cause that the codefendants had murdered their child, and did so in at least one of the aggravated ways amounting to murder in the first degree. [728-731]

INDICTMENTS found and returned in the Superior Court Department on March 23, 2007.

A motion to dismiss was heard by *John P. Connor, Jr.,* J.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

*Jane Larmon White*, Committee for Public Counsel Services, for Michael Riley.

*Chrystal A. Murray* for Carolyn Riley.

GRASSO, J. A grand jury returned indictments charging Michael Riley and Carolyn Riley with murder in connection with the death of their four year old daughter, Rebecca. On motion of the defendants pursuant to *Commonwealth* v. *McCarthy*, 385

[1]Commonwealth *vs.* Carolyn Riley.

Mass. 160, 163 (1982), a Superior Court judge dismissed so much of each indictment as alleged murder in the first degree and, as to the remaining charge of murder in the second degree, precluded the Commonwealth from proceeding at trial on theories of first prong and second prong malice.[2] The Commonwealth appeals.[3] We reverse and remand to the Superior Court for trial.

The evidence presented to the grand jury established probable cause that Michael Riley and Carolyn Riley murdered Rebecca, and did so in at least one of the aggravated ways amounting to murder in the first degree.

1. *Background.* The presentment spanned many weeks, during which the grand jury heard from thirty witnesses and received fifty-eight exhibits totaling more than 7,658 pages. The evidence, which was disturbing and graphic, established probable cause that the defendants committed murder in the first degree, intentionally killing Rebecca by feeding her clonidine, a powerful medication, well above prescribed dosages, until she died on December 13, 2006. We present only the barest outline of the evidence.

Michael and Carolyn lived with their three children, Gerard (age eleven), Kaitlynne (age six), and Rebecca (age four), in an apartment that they shared with James McGonnell (Carolyn's half brother), his fiancée Kelly Williams, and Williams's son, Brandon. Michael, who was abusive, preferred his car to the children. Michael and Carolyn subsisted primarily on supplemental security income disability payments from Social Security

---

[2]Malice aforethought as an element of murder may be proved by establishing any one of three so-called prongs of malice: (1) the defendant intended to kill the victim (the first prong); (2) "the defendant intended to do the victim grievous bodily harm (the second prong); or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong)." *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 394 n.3 (1998).

[3]The judge denied the defendants' companion claim, which asserted that the presentment impaired the integrity of the grand jury by knowingly using false or distorted evidence to obtain an indictment. See *Commonwealth* v. *Salman*, 387 Mass. 160, 166-168 (1982); *Commonwealth* v. *O'Dell*, 392 Mass. 445, 446-452 (1984). Although this aspect of the judge's ruling is not immediately appealable by the defendants, we have considered the issue and agree with the motion judge. See *Commonwealth* v. *Levesque*, 436 Mass. 443, 455 (2002).

for themselves and their children Gerard and Kaitlynne. They had applied for disability benefits for Rebecca in March, 2005, but that application was denied. The childrens' receipt of disability benefits depended, in part, on their taking certain medications. To obtain such medications for the children, the defendants embellished reports of the childrens' behavioral problems. Rebecca was diagnosed with bipolar disorder and attention deficit disorder and was prescribed three such medications — Depakote, Seroquel, and clonidine.

Carolyn gave the children clonidine to quiet them down and make them "pass out." While Rebecca and Kaitlynne were prescribed one-half pill dosages, Carolyn never cut the pills in half, always giving whole pills. She kept extra prescription bottles full of clonidine in her house and carried the medication in her purse when she went out. To assure that she always had extra on hand, Carolyn devised ways to hoard clonidine. She would fill prescriptions early and claim that she was short because she had lost or damaged other prescriptions.[4]

Carolyn knew that any increase above the prescribed dosage could be fatal. Dr. Kayoko Kifuji, who prescribed the medication for Rebecca, had warned Carolyn about clonidine's dangers and, particularly, the danger of increasing Rebecca's dosage.

In the weeks before Rebecca's death, the amount of extra clonidine doled out to quiet the children escalated. Rebecca was sedated fifteen hours at a time, from 5 P.M. until 7:30 or 8:00 A.M. the following morning. Michael insisted that the children be medicated. Whenever they began to annoy him, he told Carolyn to shut them up with clonidine — telling her to "give them their pills" and "give them their meds."

A school nurse, Rebecca's therapist, teachers, and others voiced repeated concerns regarding the amount of medication that Rebecca was receiving. They told Carolyn frequently that it was not right, and that she should get a second opinion. The school nurse, who had never seen a child on such "heavy duty" medications, became so alarmed that she contacted Dr. Kifuji.

---

[4]At the time of Rebecca's death, Carolyn had only a small number of pills on hand, when she should have had a much greater supply remaining.

Early in December, 2006, Rebecca began to exhibit symptoms of significant distress. She vomited twice a day and complained of stomach pains. McGonnell and Williams suggested that the defendants take Rebecca to see the doctor, but the defendants dismissed their concerns. By Saturday, December 9, Rebecca appeared to be very ill, with a persistent whooping-type cough. McGonnell and Williams begged the defendants to take Rebecca to the doctor's office or to the emergency room, but they declined. On Sunday, Rebecca appeared worse. She was feverish, sweating, wandered the house aimlessly, and slept almost the entire day. McGonnell and Williams again admonished Carolyn to take Rebecca to the doctor. Carolyn claimed that she had an appointment and would do so the next day.[5]

Rebecca coughed throughout the entire night. On Monday morning, rather than taking Rebecca to the doctor's office, the defendants took her with them to the Social Security office in Quincy to inquire about benefits. Michael was insistent that they be there in time for the 9:00 A.M. appointment. Rebecca vomited in the car en route, and again at the Social Security office. When they returned home, Michael complained that Rebecca had embarrassed him by "puking" at the Social Security office.

Throughout the remainder of the day, Rebecca was vomiting, coughing, walking around the apartment in a daze, and refusing to eat. Michael refused to let Rebecca come into the bedroom that he shared with Carolyn. McGonnell remonstrated that they should take Rebecca to the doctor's office or the emergency room, and offered to take her himself. Carolyn told him that they had an appointment with the doctor on Tuesday.

On Tuesday, Rebecca continued to be very ill, but the defendants did not take her to the doctor. Again, they took her to the Social Security office. Michael was angry over having to reschedule his appointment. McGonnell, who observed that Rebecca was vomiting, incoherent, and having trouble breathing, became so enraged that he threatened Michael physically. The defendants told McGonnell that they would take Rebecca to the doctor the following day for a scheduled appointment. They then put Rebecca in her bedroom and locked themselves in theirs.

---

[5]Rebecca's pediatrician had no record of any telephone calls about or appointments for Rebecca in the days preceding her death.

Rebecca knocked on their door frequently. Each time, Michael told her to "go back to [her] fucking room," and slammed the door on her. At some point, the defendants left the apartment to do errands. While they were gone, McGonnell and Williams grew increasingly alarmed at Rebecca's condition. On the defendants' return, Williams begged them to call 911. The defendants gave Rebecca cold medicine and indicated that they would take her to the doctor's the next day.

Throughout the night, Rebecca attempted to go into the defendants' bedroom on several occasions. Each time, Michael told her "no" and yelled at her, "You little bitch, Get the fuck back to your room." Rebecca was walking stiffly and appeared oblivious. At 1:00 A.M., McGonnell heard Rebecca moaning, gasping, and gargling. He cleaned some vomit off her face and kicked in the door to the defendants' bedroom. He yelled at them to call an ambulance and said that he thought Rebecca was dying. After conferring with each other for a few minutes, the defendants opened the door, brought Rebecca into the room, and told McGonnell that she would be fine until they took her to the doctor in the morning.

Rebecca was coughing constantly and annoying Michael as she lay in bed with them. He told Carolyn to give Rebecca some extra clonidine so that Rebecca would sleep and not keep waking everyone up. Although Carolyn had already given Rebecca some extra clonidine at 10 P.M., she gave Rebecca some more. After being given the clonidine, Rebecca curled up on the floor.

When they awoke in the morning, the defendants discovered that Rebecca was dead. Responding paramedics found Rebecca lying on the floor next to the defendants' bed wearing just a diaper. She had been dead for some time; rigor mortis had set in and her blood had pooled. Thick, dry, red-tinged vomitus was caked around her mouth and nose.

The cause of death was intoxication due to the combined effects of clonidine, Depakote, dextromethorphan, and chlorpheniramine. The amount of clonidine in Rebecca's system alone was fatal. Her heart and lungs were damaged from the prolonged abuse of prescription drugs. Death from an overdose of clonidine would be slow and painful. Rebecca's heart would not pump fast

enough to circulate blood to her lungs and major organs, causing them to shut down slowly. Her lungs would have gradually filled with fluid, resulting in pulmonary edema and congestive heart failure. The medical examiner opined that "the foaming red bodily fluid emanating from Rebecca's mouth and nose on scene, was evidence of a drug overdose and pulmonary edema."

The Commonwealth also presented evidence of the defendants' behavior in the aftermath of Rebecca's death that the grand jury could view, at very least, as uncaring and indicative of guilt.

2. *Discussion.* The judge erred in dismissing so much of the indictments against each defendant as alleged murder in the first degree and in restricting the Commonwealth's proof of malice aforethought at trial to third prong malice. To require more than was presented to the grand jury here conflates and confuses the accusatory role of the grand jury, the adjudicatory role of the petit jury, and the quantum of proof required at two very different stages of criminal proceedings.

a. *Nature and function of the grand jury.* The grand jury occupies a unique place in our jurisprudence. Comprised of citizens who sit independently and in secrecy, the grand jury determines whether sufficient cause exists to justify requiring a person to undergo the "public accusation of crime, and . . . the trouble, expense and anxiety of a public trial" before a jury of his peers. *Jones* v. *Robbins*, 8 Gray 329, 344 (1857). The right of indictment on probable cause is "one of the securities to the innocent against hasty, malicious and oppressive public prosecutions." *Ibid.* *Commonwealth* v. *McCravy*, 430 Mass. 758, 761-762 (2000). Indeed, the right to presentment and indictment by a grand jury is a right enshrined, as to serious crime, in art. 12 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 622 n.3 (1986).

b. *Requisites for indictment.* In keeping with the grand jury's function as a bulwark against unfounded criminal prosecution, an indictment requires a finding of probable cause. See *Lataille* v. *District Ct. of E. Hampden*, 366 Mass. 525, 532 (1974). The quantum of evidence required to indict and commence prosecution is, however, considerably less exacting than that required of the petit jury that adjudicates guilt. "When testing the suf-

ficiency of the evidence to sustain a grand jury indictment, we need not determine that the evidence would allow a reasonable person to find [the criminal conduct at issue] beyond a reasonable doubt. . . . [W]e need only find the evidence sufficient for a grand jury to find probable cause that the crime charged has been committed by these defendants." *Commonwealth* v. *Levesque,* 436 Mass. 443, 452 (2002). "Probable cause requires sufficient facts to warrant a person of reasonable caution in believing that an offense has been committed." *Id.* at 447. "[A]t the very least the grand jury must hear sufficient evidence to establish the identity of the accused and probable cause to arrest him" (citations omitted). *Commonwealth* v. *McCarthy,* 385 Mass. at 163.

Concomitants of the grand jury's investigative and screening function are relaxation of the kind of evidence on which the grand jury may rely and the review to which we subject grand jury proceedings. "As long as the evidence before the grand jury was sufficient to warrant a conclusion of probable cause and the integrity of the proceeding was unimpaired, we do not disturb an indictment." *Commonwealth* v. *Noble,* 429 Mass. 44, 48 (1999). "Any further review of grand jury proceedings would add delay and complexity without serving any significant purpose." *Ibid.* A reviewing court does not scrutinize the thought processes of grand jurors and reviews the sufficiency of the evidence according to the objective standard of probable cause to arrest. *Commonwealth* v. *DePace,* 442 Mass. 739, 744 (2004), cert. denied, 544 U.S. 980 (2005). Nor do we require the Commonwealth "to inform a grand jury of the elements of the offense for which it seeks indictment or of any lesser included offenses." *Commonwealth* v. *Noble, supra.*

While there is a preference for use of competent testimony before a grand jury, a court generally will not inquire into the competency or sufficiency of the evidence before the grand jury. See *Commonwealth* v. *Robinson,* 373 Mass. 591, 592 (1977); *Commonwealth* v. *McCarthy,* 385 Mass. at 161-162 & n.4. Indeed, an indictment may be based solely on hearsay. See *Commonwealth* v. *Gibson,* 368 Mass. 518, 522-525 (1975). The weight and credibility of the evidence is wholly for the grand jury. See *Attorney Gen.* v. *Pelletier,* 240 Mass. 264, 310 (1922).

c. *Indictments for murder in the first degree.* Murder is the unlawful killing of a human being with malice aforethought (or in the commission or attempted commission of certain felonies). See *Commonwealth* v. *Fleury*, 64 Mass. App. Ct. 282, 282-283 (2005). Our murder statute, G. L. c. 265, § 1,[6] "did not change the common law definition of murder as recognized by our courts, but simply manifested the intention of the Legislature to consider murder as a crime 'the punishment of which may be more or less severe according to certain aggravating circumstances, which may appear on the trial.' " *Commonwealth* v. *Tucker*, 189 Mass. 457, 490 (1905), quoting from *Commonwealth* v. *Gardner*, 11 Gray 438, 444 (1858). "The purpose of our murder statute, G. L. c. 265, § 1, is to gradate punishment and to categorize murder as murder in the first or second degree." *Commonwealth* v. *Matchett*, 386 Mass. 492, 502 (1982). *Commonwealth* v. *Paulding*, 438 Mass. 1, 5-7 (2002).

Here, the grand jury returned murder indictments against the defendants in the statutory form prescribed by G. L. c. 277, § 79, alleging that "on or about December 13, 2006, [each] . . . did assault and beat Rebecca Riley with intent to murder her, and by such assault and beating did kill and murder the said Rebecca Riley."[7] See *Commonwealth* v. *DePace*, 442 Mass. at 743. "The statutory form of an indictment alleging murder that is not self-limiting to murder in the second degree encompasses all theories of murder in the first degree and is sufficient to charge murder by whatever means it may have been committed." *Ibid.* See *Commonwealth* v. *Morales*, 453 Mass. 40, 52 (2009) (declining to overrule the rule in *DePace*). Accordingly, although the indictments here do not specify that the murder alleged is "in the first degree," that is the legal effect.

---

[6]General Laws c. 265, § 1, states in pertinent part: "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, . . . is murder in the first degree. Murder which does not appear to be murder in the first degree is murder in the second degree. The degree of murder shall be found by the jury."

[7]The statutory form prescribed by G. L. c. 277, § 79, authorizes the following language to be used in an indictment alleging murder in the first degree: "That A.B. did assault and beat C.D., with intent to murder him . . . and by such assault and beating did (kill and) murder C.D. (and the jurors further say that the defendant is guilty of murder in the second degree and not in the first degree). *This may be added if murder in the first degree is not alleged*" (emphasis in original).

In moving to dismiss the indictments before the Superior Court, the defendants' challenge did not go "to the face of the indictment[s]," as was the case in *DePace, supra,* but to the sufficiency of the evidence presented to the grand jury. Compare *id.* at 744. The defendants argued that the evidence before the grand jury was insufficient to establish malice in any of its prongs and, as well, to establish any of the aggravating circumstances required by statute for murder in the first degree. The motion judge agreed in part and (1) dismissed so much of the indictments as alleged murder in the first degree, and (2) precluded the Commonwealth from proceeding on first and second prong malice at trial on the remaining murder indictments. This was error.

The defendants' argument poses a question not addressed in *DePace, supra,* viz., whether the evidence before the grand jury must establish probable cause for murder and one of the aggravating forms specified in G. L. c. 265, § 1, in order to support an indictment for murder in the first degree. We conclude that there must be such evidence because, as required by art. 12, a defendant may not be convicted of an infamous crime for which he was not indicted by a grand jury. See *Jones* v. *Robbins,* 8 Gray at 347-349; *Commonwealth* v. *Barbosa,* 421 Mass. 547, 549 (1995) (no one may be convicted of crime punishable by term in State prison without first being indicted for that crime by grand jury).

Contrary to the judge's ruling and the defendants' arguments, however, we conclude that the evidence before the grand jury sufficed both as to murder and the aggravating elements of murder in the first degree. Viewing the presentment in the light most favorable to the grand jury's decision to indict, we conclude that the evidence was sufficient to establish probable cause for murder under any of the three prongs of malice. Cf. *Commonwealth* v. *Levesque,* 436 Mass. at 452. From the evidence presented, including all of the defendants' conduct toward Rebecca in the days preceding her death, the grand jury could reasonably infer that the defendants intended to kill Rebecca or cause her grievous bodily harm. Beyond the fact that the defendants' actions themselves established probable cause that they had motive and intent to kill or cause Rebecca grievous bodily harm,

the inference was amply warranted that, in the circumstances known to them, a reasonable person would have known that a plain and strong likelihood of death would follow their intended actions.

Moreover, even had the presentment only sufficed to support third prong malice, the Commonwealth's proof of malice at trial should not have been restricted as the judge did. "We have never required that there be an exact match between the evidence presented at trial and that presented to the grand jury." *Commonwealth* v. *Clayton (No. 1)*, 63 Mass. App. Ct. 608, 612 (2005). So long as the evidence suffices to establish probable cause for murder under any of its prongs, the Commonwealth is free to prove malice under any of its prongs at trial and need not present the same theory or evidence as before the grand jury. See *ibid.*

We conclude, as well, that the evidence sufficed to establish probable cause that the defendants murdered Rebecca with deliberate premeditation and with extreme atrocity or cruelty.[8] The description of the defendants' entire course of conduct and actions toward Rebecca, including their prolonged ignoring of her conscious suffering and pleas for help, was sufficient to warrant a person of reasonable caution in concluding that the killing of Rebecca was deliberately premeditated and committed with extreme atrocity or cruelty. That a mother and father do not ordinarily intend to kill or grievously harm their child, much less do so with deliberate premeditation or extreme atrocity or cruelty, is not dispositive.

Matters of intent are rarely proved by direct evidence and are most often proved circumstantially. Just as a petit jury may infer a person's knowledge and intent from the facts and circumstances presented, see *Commonwealth* v. *Casale*, 381 Mass.

---

[8]Because the evidence suffices to establish probable cause for one or more of the aggravating circumstances that amount to murder in the first degree, the Commonwealth is free at trial to prove murder in the first degree under any of the aggravating circumstances set forth in the statute. See *Commonwealth* v. *Clayton*, 63 Mass. App. Ct. at 612. See also *Commonwealth* v. *Phillips*, 452 Mass. 617, 623 (2008). The prosecution is subject, of course, to applicable rules of notice, particulars, and discovery as provided in the rules of criminal procedure. See, e.g., Mass.R.Crim.P. 13, as appearing in 442 Mass. 1516 (2004); Mass.R.Crim.P. 14, as amended, 444 Mass. 1501 (2005).

167, 173 (1980), a grand jury may conclude that there is probable cause by inferring a person's knowledge and intent from all the facts and circumstances presented. That the inference may seem less than compelling does not render the evidence establishing probable cause insufficient. Such refinements of analysis are "best reserved for a petit jury to sort out under proper instructions from the trial judge" because "the grand jury is not the appropriate forum for reconciling subtle gradations of offenses." *Commonwealth* v. *Goldstein*, 54 Mass. App. Ct. 863, 868 (2002). See *Commonwealth* v. *Simpson*, 54 Mass. App. Ct. 477, 480-481 (2002). This is not a case in which there was "no evidence" that the defendants killed Rebecca with malice aforethought, with deliberate premeditation and with extreme atrocity or cruelty, and, consequently, is not the rare case in which a court should parse and scrutinize the evidence before the grand jury.

The order dismissing the indictments for murder in the first degree and limiting the Commonwealth's proof of murder at trial is reversed. The matters are remanded for trial.

*So ordered.*