NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

12-P-867                                    Appeals Court

  COMMONWEALTH vs. JAMES C. HYDE (and seven companion cases[1]).

No. 12-P-867.

Essex.     June 12, 2015. - December 21, 2015.

Present: Cohen, Green, & Trainor, JJ.


Insurance, Motor vehicle insurance, Fraud and concealment, Defrauding insurer. Motor Vehicle, Insurance. Fraud. Larceny. Practice, Criminal, Instructions to jury, Grand jury proceedings, Indictment. Grand Jury. Evidence, Intent, Inference, Grand jury proceedings, Relevancy and materiality, Prior misconduct, Testimony before grand jury, Credibility of witness. Probable Cause. Witness, Credibility.


Indictments found and returned in the Superior Court Department on April 4, 2008.

The cases were tried before Howard J. Whitehead, J.


Edward Foye (David Meier with him) for James C. Hyde.
Sarah E. Dolven for Omar Castillo.
Argie K. Shapiro, Assistant Attorney General (William R. Freeman, Special Assistant Attorney General, with her) for the Commonwealth.

---

[1] Five against Hyde and two against Omar Castillo.

COHEN, J.  Following a multi-year inquiry by investigators from the Massachusetts Insurance Fraud Bureau and the city of Lawrence police department, a grand jury indicted the defendants, James C. Hyde, Michael H. Kaplan, and Omar Castillo, for crimes arising from the submission of fraudulent automobile insurance claims.[2]  The defendants later were tried together before a Superior Court jury.  Hyde, an attorney at the law firm of Berger & Hyde, P.C., was convicted of two counts each of motor vehicle insurance fraud (see G. L. c. 266, § 111B), larceny over $250 (see G. L. c. 266, § 30), and attempted larceny over $250 (see G. L. c. 274, § 6).  Kaplan, a chiropractor and owner of the Kaplan Chiropractic clinic, was convicted of three counts of motor vehicle insurance fraud, and two counts each of larceny over $250 and attempted larceny.  Castillo, an employee of Kaplan Chiropractic, was convicted of one count each of motor vehicle insurance fraud and larceny over $250.  Before us are the appeals of Hyde and Castillo.[3]

---

[2] Other individuals also were indicted on fraud charges, including Leo Lopez and Christopher Ortega, who signed cooperation agreements and testified against the defendants.

[3] Kaplan noticed an appeal, which was stayed while he pursued a motion for a new trial.  After an evidentiary hearing in the trial court, the motion for new trial was denied. Subsequently, Kaplan's motion to dismiss his appeal was allowed, with prejudice.

Hyde's convictions resulted from insurance claims submitted on behalf of clients purporting to have been injured in two staged automobile accidents -- one alleged to have occurred on October 1, 2002, and the other alleged to have occurred on December 20, 2002. Hyde's primary contention on appeal is that the Commonwealth failed to establish at both the grand jury and petit jury stages of the case that he knew that these particular accidents were staged. On this ground, he maintains that both his pretrial motion to dismiss the indictments and his motion for required findings of not guilty at trial should have been allowed. In addition, Hyde argues that the indictments should have been dismissed for the additional reason that the integrity of the grand jury proceedings was impaired, and that he is entitled to a new trial as a result of the erroneous admission of prior bad act evidence.

Castillo's convictions resulted from his role in helping to stage the December 20 accident. Castillo argues that there was insufficient evidence that he knew that statements submitted to insurance companies with regard to that accident were false, and, therefore, his motion for required findings of not guilty should have been allowed. Castillo also argues that he is entitled to a new trial as a result of the erroneous admission of checks written to him by Berger & Hyde, P.C. For the following reasons, we affirm both defendants' convictions.

Background.  The jury could have found the following facts. In 2000, Leo Lopez began to work as an assistant and van driver at Kaplan Chiropractic.  Shortly after starting the job, Lopez brought his mother to Kaplan Chiropractic for treatment of a work-related shoulder injury.  When Kaplan gave him $100 in cash for bringing his mother in, Lopez learned that it was Kaplan's policy to pay his employees cash bonuses when they referred new patients to the clinic.  Kaplan later told Lopez that he could make extra money by setting up motor vehicle accidents.  Kaplan explained how to stage an accident by obtaining two cars (one to play the "at fault" role, and the other to play the "not at fault" role), recruiting a driver and passengers for each car, crashing the cars together, preparing accident reports, and bringing the accident participants first to a chiropractor and then to an attorney.

On December 5, 2000, Lopez staged his first accident.  He drove his own car, which he was eager to replace, and arranged for a woman to hit it with her minivan.  The next day, he went to Kaplan for treatment.  At Kaplan's recommendation, Lopez promptly went to see Hyde at his law firm.  At that meeting, Hyde explained that Lopez would need to accumulate $2,000 in

medical bills to have a case,[4] and gave him an envelope containing a check for $200 for bringing the matter to the firm. Hyde also promised to "take care of [him]" if he referred more clients.

To build up his medical expenses, Lopez went to a few actual physical therapy sessions at Kaplan Chiropractic, and then pretended to receive further treatment. Lopez also went back to Hyde's office to fill out a personal injury protection form to obtain no-fault benefits for alleged lost wages,[5] even though he had not stopped working. Hyde eventually settled Lopez's case for $5,300, from which Hyde took $1,325.

Lopez testified in some detail about the period between December, 2000, through September, 2002. At first, he staged "live" two-car collisions, where police and other emergency responders would be called to the scene. However, by mid-2001, he had transitioned to staging "paper" accidents. In those instances, he would obtain and damage two cars, recruit people willing to pose as the occupants, and fill out paperwork as if a real accident had occurred. The day after each purported accident, the persons pretending to be the injured occupants

---

[4] Hyde was referring to the so-called tort threshold that is a feature of the Massachusetts no-fault insurance scheme. See G. L. c. 231, § 6D, as amended by St. 1988, c. 273, § 55.

[5] See G. L. c. 90, §§ 34A, 34M.

would be taken to one of two chiropractors and one of two lawyers, based on whether they were the designated occupants of the "at fault" vehicle or the "not at fault" vehicle.  The chiropractor was either Kaplan or another chiropractor who practiced at Haverhill Family Chiropractic, and the lawyer was either Hyde or another lawyer who practiced at a different firm.[6]

Castillo, another van driver for Kaplan, also was engaged in the scheme.  He staged accidents, brought the participants to Kaplan for treatment, and obtained payments from Kaplan in return.  Castillo, too, was introduced to Hyde, and received referral fees from Hyde when he brought Hyde new clients.

Lopez's reputation grew to the point where members of the community would approach him to volunteer their participation. He enlisted the help of a friend, Christopher Ortega, and paid him a share of the referral fees.  The two would recruit participants, coach them on their roles in the fictitious accidents, and tell them how to respond to medical, legal, and insurance professionals.  From December, 2000, through September, 2002, Lopez referred participants in more than twenty staged accidents to Kaplan Chiropractic or Haverhill Family Chiropractic, and to Hyde or the other lawyer involved in these

___

[6] The other chiropractor and lawyer also were indicted, but those indictments ultimately were dismissed.

ruses. Both Kaplan and Hyde would pay Lopez for each individual whom he referred to their respective practices.

As Lopez became friendly with Hyde, the two had a number of private conversations where Hyde made specific suggestions about how best to stage the accidents. For example, Hyde told Lopez that there were three insurance companies to be avoided, because they were "really going hard investigating the accidents." On four or five occasions, Hyde told Lopez to keep the number of people in a vehicle to no more than three. Ortega testified to similar conversations with Hyde in which Hyde explained that too many passengers "would bring up red flags" with the insurance companies. On the other hand, Lopez also understood from discussions with Kaplan, that if there were too few passengers, there would not be enough money. Sometimes Hyde would tell Lopez that he should "coach" a nervous client "better," in case the insurance company sent out an investigator to ask the client questions. Hyde explained that if the client gave a statement that was inconsistent with the accident report, it would raise suspicions, and no one would get paid.

Lopez testified that on more than one occasion in the period from December, 2000, through September, 2002, he told Hyde that the clients he was referring were from staged accidents. However, Lopez and Ortega also testified that sometimes the accident victims they referred were legitimate.

Ortega estimated that "20 percent [were] real and the rest [were] fake."

The October 1, 2002, and December 20, 2002, staged accidents were both paper accidents.  The premise of the October 1 accident was that a Jaguar driven by Antonia Almanzer and carrying two passengers, was struck in the rear by a Ford Explorer driven by Kelly Birchall and carrying four passengers. Birchall was the godmother of Lopez's son, and had agreed "to take the fall."  The accident was orchestrated by Lopez and Ortega, who damaged the Explorer by driving it into a wall.  The Explorer actually was owned by one of the ostensible passengers, who was paid $500 for its use as the "at fault" vehicle.

Lopez filled out the operator's report for the purported driver of the Explorer, supplying information about the two vehicles, the names and personal data of the occupants, and a description of the accident, including the time, date, and location of the collision.  Lopez, along with Ortega, also brought the Explorer passengers to Haverhill Chiropractic and then to Hyde's law firm.  At the law firm, the passengers met as a group with Miguel Nieves, Hyde's associate.  They never met Hyde, personally.  Medical bills were generated, and Hyde submitted claims on behalf of the passengers.  As a result, the insurer paid more than $250 in medical payments to Haverhill Chiropractic on behalf of one or more claimants.  By check dated

October 1, 2002, Lopez received a check for $1,000 from Hyde for having referred these clients to him.

Accompanied by Nieves, the clients later were examined under oath by the insurer. Subsequently, on August 28, 2003, the insurer denied the claims in a letter to Hyde stating that its investigation revealed that the "accident was not of a direct or accidental nature." The letter explained that the examinations under oath "yielded vague and inconsistent testimony, especially in regards to what happened before and after the loss"; there were no police, ambulance, or fire department personnel called to the scene; there were no witnesses; and accident reconstruction had determined that the damage done to the vehicles "[did] not support a mutual contact exchange between the vehicles allegedly involved." Upon receiving the denial letter, Hyde wrote to his clients informing them that their claims had been rejected and that he would not continue to represent them.

The December 20, 2002, accident came about when Castillo approached Lopez and said that a friend of his, Eddy Ramirez, wanted his Mazda MPV minivan totaled. Lopez then asked Ortega to find a second vehicle to play the "at fault" role, so that they could create another paper accident. The premise of the December 20 accident was that the MPV, driven by Ramirez and transporting three passengers, was struck on the side by a Mazda

Protege driven by Jose Marti, and carrying three passengers. Ramirez, having been given the facts of the accident by Castillo, completed an operator's report and submitted it to his insurer. At Castillo's direction, Ramirez and his three passengers went to Kaplan for treatment; Castillo also accompanied the group to Hyde's law firm. Lopez remembered going with Castillo to this meeting at Hyde's office, and informing Hyde in person that he and Castillo were both involved and that they would be splitting the referral fee.

At the law firm, Ramirez and his passengers dealt exclusively with Nieves and never met Hyde. Hyde submitted claims for the clients' medical bills, and the insurer made payments in excess of $250. Eventually, however, on November 21, 2003, the insurer denied the claims stemming from the December 20 accident, stating that its investigation had shown that "the loss did not occur as alleged by [Hyde's] clients." The insurer explained that the "claimants could not provide consistent and credible testimony regarding the events surrounding the loss, and . . . the two vehicles allegedly involved did not collide as described." Hyde wrote to the clients informing them of the denial, and discontinued representing them.

Discussion. 1. Hyde's arguments. a. Sufficiency of the evidence at trial. Each of the crimes of which Hyde was

convicted requires proof that he knowingly made false statements when he submitted the claims. See Commonwealth v. Charles, 428 Mass. 672, 683 n.8 (1999); Commonwealth v. Jerome, 56 Mass. App. Ct. 726, 732 (2002).[7] Hyde's argument is that even if the Commonwealth adduced sufficient evidence through Lopez and Ortega that Hyde knew generally about the scheme, such proof did not give rise to a reasonable inference that he knew that the October 1 and December 20 accidents were staged, particularly in light of the evidence that Lopez and Ortega also sometimes referred legitimate accidents to him.

We consider Hyde's argument under familiar standards. Evidence is sufficient to reach the jury, and a motion for a required finding of not guilty is properly denied, where the

---

[7] A conviction of "[m]otor vehicle insurance fraud, G. L. c. 266, § 111B, requires that (1) the defendant, in connection with a claim under a motor vehicle insurance policy issued by an insurer, (2) with the intent to injure, defraud, or deceive such insurer, (3) did knowingly present to it, or aid or abet in or procure the presentation to it, (4) a notice, statement, or proof of loss, (5) knowing that such notice, statement, or proof of loss contained a false or fraudulent statement or representation, (6) of any fact or thing material to such claim. Larceny by false pretenses, G. L. c. 266, § 30 [the theory of larceny presented to the jury in this case], requires that (1) the defendant knowingly make a false statement, (2) intending the person to whom it was made to rely on its truth, (3) the person to whom it was made relies on the false statement, and (4) based on such reliance, the person parts with personal property." Commonwealth v. Charles, 428 Mass. at 683 n.8. The third charge, attempted larceny by false pretenses, "require[s] a specific intent to commit the underlying offense, an overt act towards that commission, and a failure to complete the crime." Commonwealth v. Bell, 83 Mass. App. Ct. 82, 85 (2013).

evidence, viewed in the light most favorable to the Commonwealth and drawing all inferences in favor of the Commonwealth, would permit a rational jury to find each essential element of the crime beyond a reasonable doubt. Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979). "A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial." Commonwealth v. Casale, 381 Mass. 167, 173 (1980). See Commonwealth v. Jerome, 56 Mass. App. Ct. at 732. "To survive a motion for a required finding, it is not essential that the inferences drawn are necessary inferences. It is enough that from the evidence presented a jury could, within reason and without speculation, draw them." Commonwealth v. Peck, 86 Mass. App. Ct. 34, 41 (2014), quoting from Commonwealth v. Gonzalez, 47 Mass. App. Ct. 255, 257 (1999). See Corson v. Commonwealth, 428 Mass. 193, 197 (1998).

Here, the testimony of Lopez and Ortega about their conversations with Hyde established that Hyde knew that they routinely brought him clients whose accidents were staged. While neither Lopez nor Ortega testified that he specifically informed Hyde that the October 1 and December 20 accidents were fictitious, the jury nevertheless reasonably could infer from

the circumstances surrounding these accidents that Hyde knew they were staged.

Particularly telling was the number of clients brought to Hyde after each of these accidents. Lopez had testified to his understanding that if there were too few occupants, the accident would not generate enough money for all concerned; he also had a personal incentive to stage accidents involving large numbers of occupants, because he received fees for each individual he referred. Indeed, the jury could infer that it was because of this incentive that, as Lopez testified, Hyde had found it necessary to discuss with him some four to five times the need to keep the number of people in the accident vehicles to no more than three per vehicle, so as not to raise "red flags" with the insurance companies.

Thus, when four of five occupants of the Ford Explorer were brought to his office after the October 1 accident, and all four occupants of the Mazda MPV were brought to his office after the December 20 accident, Hyde was put on notice that these accidents most likely were staged. Hyde also would have been alerted by the fact that, consistent with the attributes of a paper accident, in neither the October 1 nor the December 20 accident were first responders summoned or independent witnesses identified.

When Lopez and Castillo made a point of informing Hyde that they were both involved and would split the referral fees associated with the December 20 accident, that also signaled that this accident was not legitimate. The jury reasonably could infer that Hyde would have understood a fee-splitting arrangement between two individuals known to produce staged accidents to mean that both had participated in creating it. Hyde also would have realized when he submitted the claims to the insurers that the clients he obtained from these accidents had accumulated substantial medical bills for the treatment of relatively minor injuries from which they were slow to recover; and Hyde, no less than the insurers that ultimately denied the claims, also would have noticed that the damage to the vehicles and the participants' stories did not coherently explain the alleged events.

The jury also could consider Hyde's behavior in handling the claims. Although Hyde was the attorney of record on both cases, he met with none of the clients he received from the October 1 and December 20 accidents. Instead, he assigned his associate, Nieves, to handle all of the personal interactions with them. The jury reasonably could infer that this was Hyde's way of distancing himself from claims he knew to be fraudulent. Also indicative of Hyde's knowledge was his failure to challenge

the insurers' denials; instead he promptly abandoned the cases and the clients.

Hyde emphasizes that the above attributes also could be consistent with legitimate accidents. However, the aggregation of so many telltale indications sufficed to permit the conclusion that Hyde knew that the October 1 and December 20 accidents were fictitious. As this court stated in another case involving an attorney's submission of fraudulent automobile insurance claims, "[w]hile each factor by itself likely would not be enough to support conviction," the "circumstances present[ed] sufficient evidence of knowledge . . . for a rational jury to find the defendant's guilt beyond a reasonable doubt." Commonwealth v. Lonardo, 74 Mass. App. Ct. 566, 570 (2009).[8]

Hyde's further argument, that the judge erroneously employed a lower standard than "actual knowledge," is also without merit. The record reflects that the judge plainly utilized an actual knowledge standard in ruling that the

---

[8] Hyde accurately points out that Lonardo arose in somewhat different circumstances. The defendant in that case was convicted of conspiracy to commit automobile insurance fraud, and not, as here, of substantive crimes. In the present case, although Hyde, Kaplan, and Castillo originally were charged with conspiracy, those counts were not tried, and later were placed on file with the defendants' consent. Despite this distinction, however, the basic underlying principle is the same. In proving its case the Commonwealth was not required to adduce direct evidence of the defendant's knowledge.

Commonwealth's case was sufficient to go to the jury. Notwithstanding some back and forth discussion of the potential applicability of the evidentiary principle of "willful blindness,"[9] the judge explicitly decided the motion for required findings based upon his assessment that "the evidence is such that the jury could infer actual knowledge with respect to these two episodes."

The judge's consistent application of the actual knowledge standard is further shown by his final charge, where he told the jury repeatedly that the Commonwealth was required to prove that Hyde had "actual subjective knowledge" that the statements he made to the insurers were false, and that it was not enough for the Commonwealth to establish that he was "naive or negligent in pursuing the truth." Later, when the jury asked during deliberations whether they needed specific evidence for a specific indictment, the judge again informed them that it was

---

[9] Under this principle, an individual's knowledge may be inferred if he intentionally closed his eyes to what would have been obvious to him. "A willful blindness instruction is appropriate when (1) 'a defendant claims a lack of knowledge,' (2) 'the facts suggest a conscious course of deliberate ignorance, and' (3) 'the instruction, taken as a whole, cannot be misunderstood [by a juror] as mandating an inference of knowledge.'" Commonwealth v. Mimless, 53 Mass. App. Ct. 534, 544 (2002), quoting from United States v. Hogan, 861 F.2d 312, 316 (1st Cir. 1988). Attentive to the defendants' arguments, and concerned that instructing on willful blindness conceivably could give the jury the erroneous impression that they did not have to find actual knowledge, the judge here ultimately decided not to give such an instruction.

not enough for the Commonwealth to prove beyond a reasonable doubt that the defendant knew that false statements were made in connection with other accidents; the Commonwealth was required to prove that a false statement was made with respect to the accident under consideration and that the defendant had actual knowledge that the statement was false. The judge also recharged the jury at length on appropriate and inappropriate inferences, and again explained that any inference establishing an element, such as knowledge, must be drawn beyond a reasonable doubt.

b. Evidence of other staged accidents. Hyde argues that it was unduly prejudicial for the jury to hear evidence of another staged accident alleged to have occurred on October 10, 2002, which was uncharged as to him.[10] Clients from this accident were brought to Hyde's firm, but the claims were processed by Hyde's partner, Carl Berger. The judge initially declined to exclude the evidence on the expectation that the Commonwealth would establish that Hyde knew about that accident or was connected with it in some way. However, at the end of the trial, the judge ruled that the Commonwealth had shown no such connection between Hyde (or Castillo, for that matter) and the October 10 accident, and charged the jury accordingly.

---

[10] Only Kaplan was charged in connection with that accident.

The judge told the jury that in considering the charges against Hyde, the jury could not consider any evidence concerning the October 10, 2002, accident, "because there's no evidence that Mr. Hyde had any involvement in that matter nor, in fact, is there any evidence that Mr. Berger himself was aware that anything was amiss, if in fact it was amiss, with respect to that accident."  He then repeated the instruction for emphasis a moment later.  We are confident that any conceivable prejudice to Hyde from the admission of evidence about the October 10 accident was prevented by these pointed instructions.

Hyde also alludes in a footnote to evidence of two other uncharged accidents dated January 16, 2002, and March 16, 2002. Because "[a]rguments relegated to a footnote do not rise to the level of appellate argument," we need not consider his argument. Commonwealth v. Springfield Terminal Ry. Co., 80 Mass. App. Ct. 22, 42 n.32 (2011) (citation omitted).  In any event, Hyde has demonstrated no abuse of discretion in admitting evidence of these staged accidents, which was necessary to establish important background facts about the scheme, including the origin of concerns about the number of people in a vehicle and Lopez's transition to staging paper accidents.

c.  Grand jury issues.  Hyde renews his claims, rejected by the trial judge, that he was entitled to the allowance of his motion to dismiss the indictments.  He first claims that the

grand jury heard no direct evidence that he knew that the accidents for which he was indicted were staged, and, therefore, his motion should have been allowed pursuant to Commonwealth v. McCarthy, 385 Mass. 160 (1982). Hyde does not dispute that the testimony of several witnesses (including Ortega and two other referrers who brought him clients from staged accidents) established that, in other instances, he knew that he was representing clients whose claims were not legitimate. His argument is that, as to the October 1 and December 20 accidents, the Commonwealth impermissibly asked the grand jury to infer guilty knowledge based upon evidence of wrongdoing at other times, and that everything he did with respect to the October 1 and December 20 accidents "was as consistent with processing a legitimate case as processing a known fabricated accident."

In reviewing the evidence before the grand jury we keep in mind that "an indictment requires a finding of probable cause." Commonwealth v. Riley, 73 Mass. App. Ct. 721, 726 (2009). This is a far lower standard than that needed to survive a motion for a required finding of not guilty at trial. "The quantum of evidence required to indict and commence prosecution is . . . considerably less exacting than that required of the petit jury that adjudicates guilt." Ibid.

Here, the circumstantial evidence of Hyde's knowledge about the October 1 and December 20 accidents was of substantially the

same character as the trial evidence previously discussed. Ortega and two other referrers testified generally about staging accidents and to conversations with Hyde reflecting his awareness that he was receiving clients from accidents that were not legitimate. Ortega testified that, after staging an accident and bringing the participants to the chiropractor, he would call Hyde's office to make sure that Hyde was there, bring in the participants, and give Hyde the accident report. Hyde would meet with Ortega and Lopez privately in his office and look through the report to make sure everything was in order. Hyde would ask if the participants had been coached as to the facts of the accident, and, on occasion, would dispense guidance as to how best to set up the accidents so as not to raise any flags. Ortega specifically testified that he had such closed door meetings in connection with the charged accidents. This testimony, as well as other evidence showing that the October 1 and December 20 accidents bore the earmarks of being staged, permitted the grand jury to find probable cause to believe that Hyde knew that the claims he submitted as a result of these accidents were fraudulent. See Commonwealth v. Riley, 73 Mass. App. Ct. at 731 ("grand jury may . . . infer[] . . . knowledge and intent from all the facts and circumstances presented"). Contrast Commonwealth v. Reveron, 75 Mass. App. Ct. 354, 357-359 (2009).

Hyde also contends that the integrity of the grand jury proceedings was impaired and, hence, his motion to dismiss should have been allowed under Commonwealth v. O'Dell, 392 Mass. 445 (1984).  However, "[t]o sustain a claim that the integrity of the grand jury proceeding has been impaired, not only must the evidence have been given with knowledge that it was false or deceptive, but the false or deceptive evidence must probably have been significant in the view of the grand jury and must have been presented with the intention of obtaining an indictment."  Commonwealth v. Mayfield, 398 Mass. 615, 621 (1986).  See Commonwealth v. Mathews, 450 Mass. 858, 876 (2008). Hyde has not met these criteria here.

Hyde first points to the testimony of an investigator from the Insurance Fraud Bureau, and, specifically, to the investigator's testimony about so-called "runners."  The investigator testified to the effect that runners are people who, under the direction of chiropractors and attorneys, orchestrate staged accidents and recruit participants for those accidents.  Hyde argues that this testimony improperly implied that the use of "runners" to bring in business was, in itself, criminal.  As the investigator explained, however, this was how the term "runner" was used in the insurance industry, and the investigator did not know how other people would define it.

Suffice it to say that the grand jury heard conflicting testimony on this topic. Ortega testified along the same lines as the investigator about the role of "runners." On the other hand, there was testimony from two other witnesses that runners are simply nonlawyers who bring in clients for a fee. The function of the acknowledged "runners" in this case, including Lopez and Ortega, ultimately was for the grand jury to decide based upon the weight and credibility of the evidence. Commonwealth v. Riley, 73 Mass. App. Ct. at 727.[11]

Hyde also points to the testimony of a witness who did not speak English and who claimed to have spoken with Hyde about staged accidents through a translator identified only as "Jose." However, Hyde has not shown that the witness's testimony was falsely or inaccurately presented to the grand jury in any way. Even if it was left unclear how well Jose interpreted what Hyde said to the witness, it was for the grand jury to evaluate the strengths and weaknesses of this evidence.

Hyde also claims that the Commonwealth failed adequately to inform the grand jury that Ortega had received inducements to testify. Citing Commonwealth v. Mayfield, 398 Mass. at 620-621,

---

[11] Another statement of the investigator challenged by Hyde, that Hyde represented runners who brought accidents to him, was true, even if not corroborated. Nor do other alleged inaccuracies in the investigator's testimony rise to the level of potentially affecting the fairness of the grand jury process.

Hyde characterizes such information as exculpatory evidence that greatly undermined Ortega's credibility. However, we need not reach the issue, because the grand jury knew full well before voting on the indictments, that Ortega was benefiting from his cooperation with the Commonwealth. It is true that the first time he testified, on September 14, 2007, Ortega stated that there were no promises made to him in connection with his appearance at the grand jury proceedings that day. However, the second time he testified, the Commonwealth asked him a series of questions about his cooperation agreement, and Ortega admitted that he had agreed to cooperate with the investigation and had signed a letter to that effect on July 19, 2007. The agreement then was presented to the grand jury.

In sum, it is questionable whether any of the challenged testimony was seriously misleading; but even if the grand jury heard inaccurate information, Hyde has failed to show that the Commonwealth offered any testimony knowing that it was false or deceptive, or that such testimony probably influenced the grand jury's determination to indict.

2. Castillo's arguments. a. Sufficiency of the evidence at trial. There is no merit to Castillo's argument that the Commonwealth failed to prove that he knew that statements made to insurance companies in connection with the December 20 accident were false. The evidence showed not only that Castillo

knew the December 20 accident was staged, but that he had instigated that accident with the intention of financially benefiting a friend.

Lopez testified that Castillo approached him about staging the December 20 accident so that Castillo's friend, Ramirez, could have his minivan totaled. Castillo told Lopez that he had his party all set and that all he needed was an "at fault" vehicle. Lopez and Ortega then found the at fault vehicle and put together the staged accident. After the accident, Castillo directed the people in Ramirez's vehicle to Kaplan and Hyde. Lopez and Castillo went to Hyde's office together to inform him, in person, that they were jointly involved and would split the referral fee. This evidence was more than sufficient to establish that Castillo knew and intended that false claims would be submitted by Hyde. Any conflicts in the evidence as to the nature and extent of Castillo's participation were for the jury to resolve.

b. Admission of checks. Castillo was charged only in connection with the December 20 accident. He therefore objected to the introduction of Berger & Hyde, P.C., checks written to him at other times, on the basis that the jury could draw an unfair inference that the other checks also represented payments for insurance fraud schemes that the defendant simply "didn't get caught on." "Whether evidence is relevant and whether its

probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." Commonwealth v. Simpson, 434 Mass. 570, 578-579 (2001). See Mass. G. Evid. § 403 (2015). Here, the judge could conclude in his discretion that the checks were highly probative of Castillo's referral relationship with Hyde. Furthermore, the admission of the checks was cumulative and nonprejudicial. Luke Goldworm, an investigator with the Attorney General's Office, testified to the same facts without objection or challenge on appeal, i.e., that Berger & Hyde, P.C., had issued Castillo six checks that totaled about $2,500.[12]

Judgments affirmed.

---

[12] To the extent that we have not specifically addressed subsidiary arguments in the defendants' briefs, they have not been overlooked. "We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).